

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE EL PASO EDUCATION INITIATIVE, INC. d/b/a BURNHAM WOOD CHARTER SCHOOL, | § | No. 08-17-00049-CV |
| | § | Appeal from the |
| Appellant, | § | County Court at Law No. 6 |
| v. | § | of El Paso County, Texas |
| AMEX PROPERTIES, LLC, | § | (TC# 2008-2370) |
| Appellee. | § | |
| | § | |

## O P I N I O N

Appellant, the El Paso Education Initiative, Inc. (EPEI) appeals the trial court's denial of its plea to the jurisdiction in which EPEI asserts that it is immune from the breach of contract suit filed by Appellee, Amex Properties, LLC (Amex). First, EPEI asserts it is immune from suit as the underlying contract that is a basis of the suit was not "properly executed" pursuant to the waiver of immunity. Second, even if immunity is waived, EPEI asserts that the statutory waiver of immunity precludes an award of consequential damages and attorney's fees. We affirm in part and reverse in part.

### BACKGROUND

*Factual Background*

The breach of contract claim underlying this appeal stems from a lease agreement between

EPEI and Amex. EPEI, doing business as Burnham Wood Charter School District, operates open-enrollment charter schools chartered by the Texas Education Agency. Vista Del Futuro Charter School is one of the charter schools operated by the school district. In early 2008, Iris Burnham, EPEI's president and superintendent of schools, informed EPEI's board of directors that EPEI was searching for sites for the location of Vista Del Futuro Charter School.

After locating a suitable site in east El Paso, Burnham began negotiating with Silvia Martinez Aguirre, part owner of Amex, to lease the property and construct a building for the operation of the school.[1] Working with EPEI's board of directors, Burnham reviewed a proposal for entering a lease with Amex and presented the board with the projected multi-year rent schedule and budget for the charter school. The minutes from this meeting state that "Burnham asked the Board's permission to continue to negotiate a lease with Ms. Martinez," which the board granted. To construct the building EPEI desired, Amex had contracted with AbM Construction Co., who had begun the construction process.

Burnham and Martinez signed a document titled "Lease Agreement" after a series of negotiations, which included their respective attorneys, Jerry Wallace for EPEI and Victor Firth for Amex.[2] On either of two dates, Friday, April 25, or the following Monday, April 28, Martinez verbally informed the charter school's general administrator, Rebeca Perez, and its realtor, Juan Uribe, that she had signed the written Lease Agreement. An email dated April 25 sent from Attorney Jerry Wallace to Administrator Perez states:

> The lease agreement needs to be signed by both ms. Burnham on
> behalf of the charter and ms. Martinez on behalf for [sic] the property

---

[1] The property's location is: 1441 N. Zaragoza Rd., El Paso, Texas, 79936.

[2] For a more detailed recitation of the background surrounding the formation of the "Lease Agreement," see *El Paso Educ. Initiative, Inc. v. Amex Properties, LLC*, 385 S.W.3d 701, 703–04 (Tex. App.—El Paso 2012, pet. denied).

2

owner.

Our suggesting [sic] is that you contact. ms. Martinez, inform her that the document has been signed by ms. burnham, and ask her to come by and execute the document. You can also inform her that we have transmitted the document to victor firth for his review.

I'm sure that ms. Martinez will want an original executed and notarized lease instrument, so you should either have ms. burnham and ms. Martinez execute two leases, or simply make a copy of the lease after ms. Martinez has signed it and her signature has been notarized. Either method will work just fine.

Thanks,

jerry

The Lease Agreement contained a recital stating that the document was "[e]xecuted as of 17 April 2008" and included Martinez's signature as manager of the landlord of the lease (Amex), and Burnham's signature as president of the tenant of the lease (EPEI). It also contained an Entire Agreement provision which specified that "[s]ubmission of this Lease for examination does not constitute an option for the Leased Premises and becomes effective as a Lease only upon execution and delivery thereof by Landlord to Tenant." In addition, the Authority of Signatories provision of the lease stated: "Each person executing this Lease [Agreement] individually and personally represents and warrants that he/she is duly authorized to execute and deliver the same on behalf of the entity for which he/she is signing (whether a corporation general or limited partnership or otherwise) and that this Lease [Agreement] is binding upon the entity in accordance with its terms."

Contained within the Lease Agreement were also two notarized certificates of acknowledgement. The first, a certificate acknowledging that Martinez's signature, was signed on April 25 by a notary public stating that Martinez, as "Manager of Amex," appeared and acknowledged that Martinez had executed the Lease Agreement "for the purposes and considerations therein expressed and on behalf of" Amex. The second, a certificate acknowledging

3

that Burnham's signature, was signed on April 24 by a notary public stating that Burnham, as "President" of EPEI, had appeared and acknowledged that she had executed the Lease Agreement "for the purposes and considerations therein expressed and on behalf of The El Paso Education Initiative, Inc."

Unaware that Burnham and Martinez had signed the Lease Agreement, Firth continued to negotiate the terms and conditions of the agreement with Wallace until Sunday, April 27. On May 13, Wallace sent Amex notice that the charter school was unequivocally rejecting the Lease Agreement and that it no longer desired to lease any property from Amex.

*Procedural Background*

Amex sued EPEI, claiming that EPEI anticipatorily breached the lease and sought actual damages, consequential damages, and attorney's fees. EPEI filed its first plea to the jurisdiction, which the trial court denied as to the breach of contract claim and associated claims for consequential damages and attorney's fees. This Court affirmed the trial court's denial of the plea to the jurisdiction in a previous opinion. *El Paso Educ. Initiative, Inc. v. Amex Properties, LLC*, 385 S.W.3d 701 (Tex. App.—El Paso 2012, pet. denied) (*EPEI I*). The Texas Supreme Court denied EPEI's petition for review of that decision on March 29, 2013, and the case resumed in the trial court. EPEI filed a second plea to the jurisdiction, and after Amex amended its petition, filed its third plea to the jurisdiction. The trial court dismissed the tort claims Amex added in its subsequent petitions but again denied the plea to the jurisdiction that challenged the breach of contract suit, claims for consequential damages, and attorney's fees. This second interlocutory appeal followed.

**DISCUSSION**

In this interlocutory appeal, EPEI raises three issues contending that the trial court erred in

4

denying EPEI's plea to the jurisdiction. First, it argues that the trial court erred in denying its plea to the jurisdiction because the purported contract was not "properly executed" on behalf of EPEI. Second, it argues that the trial court erred in denying its plea to the jurisdiction as it related to EPEI's claim for consequential damages flowing from the breach of contract claim. Third, it argues that the trial court erred in denying its plea to the jurisdiction as it related to EPEI's claim for attorney's fees.

*Standard of Review—Plea to the Jurisdiction*

A plea to the jurisdiction is a dilatory plea by which a party challenges the court's authority to determine the subject matter of the action. *Harris County v. Sykes,* 136 S.W.3d 635, 638 (Tex. 2004); *JNC Land Co., Inc. v. City of El Paso*, 479 S.W.3d 903, 907 (Tex. App.—El Paso 2015, pet. denied). Whether a party has alleged facts that affirmatively demonstrate a trial court's subject matter jurisdiction is a question of law that we review *de novo*. *Texas Department of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex. 2004). The burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction. *Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012).

When a plea to the jurisdiction challenges the pleadings, we look to the pleader's intent, construe the pleadings liberally in favor of jurisdiction, and accept the allegations in the pleadings as true to determine if the pleader has alleged sufficient facts to affirmatively demonstrate the trial court's jurisdiction to hear the case. *Heckman,* 369 S.W.3d at 150; *JNC Land*, 479 S.W.3d at 907. "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend." *Miranda*, 133 S.W.3d at 226–27. If the pleadings affirmatively negate the existence of jurisdiction, then a

plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend its pleading. *Id*. at 227.

When a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider the relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, even where those facts may implicate the merits of the cause of action. *City of Waco v. Kirwan,* 298 S.W.3d 618, 622 (Tex. 2009); *Miranda,* 133 S.W.3d at 227. This standard generally mirrors that of a summary judgment under Rule 166a(c) of the Texas Rules of Civil Procedure. *Miranda,* 133 S.W.3d at 228; *see also* TEX. R. CIV. P. 166a. Under this standard, when reviewing a plea in which the pleading requirement has been met, we credit as true all evidence favoring the nonmovant and draw all reasonable inferences and resolve any doubts in the nonmovant's favor. *Id*. The movant must assert the absence of subject matter jurisdiction and present conclusive proof that the trial court lacks subject matter jurisdiction. *Id*. If the movant discharges this burden, the nonmovant must present evidence sufficient to raise a material issue of fact regarding jurisdiction, or the plea will be sustained. *Shelton v. Kalbow*, 489 S.W.3d 32, 40 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (citing *Miranda,* 133 S.W.3d at 228). If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact question must be resolved by the fact finder. *Miranda,* 133 S.W.3d at 227–28. The trial court rules on the plea to the jurisdiction as a matter of law if the relevant jurisdictional evidence is undisputed or it fails to raise a fact question on the jurisdictional issue. *Id.* at 228.

*Applicable Law:  Governmental Immunity*

Sovereign immunity protects the State and its agencies from lawsuits for money damages. *Texas Nat. Res. Conservation Com'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002). Political

subdivisions of the state are entitled to such immunity—referred to by the term governmental immunity—unless such immunity has been waived. *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006); *JNC Land*, 479 S.W.3d at 908. Sovereign immunity encompasses immunity from suit, which bars a suit unless the state has consented, and immunity from liability, which protects the state from judgments even if it has consented to the suit. *Reata Const. Corp.*, 197 S.W.3d at 374. Immunity from suit implicates a court's subject matter jurisdiction and is properly asserted in a plea to the jurisdiction. *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016); *Miranda*, 133 S.W.3d at 225-26. Texas open-enrollment charter schools are governmental entities entitled to immunity from suit to the same extent as public-school districts. *EPEI I*, 385 S.W.3d at 705–06.

By entering into a contract, a governmental entity necessarily waives immunity from liability, voluntarily binding itself like any other party to the terms of the agreement, but it does not itself waive immunity from suit. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). Immunity from suit may only be waived by the Legislature to protect its policymaking function. *Id*. (citing *IT-Davy*, 74 S.W.3d at 854). To ensure that legislative control is not easily disturbed, a waiver of immunity must be clear and unambiguous. *Tooke*, 197 S.W.3d at 329 n.2, 332-33 (citing TEX. GOV'T CODE ANN. § 311.034) ("In order to preserve the legislature's interest in managing state fiscal matters through the appropriations process, a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."). The issue raised here is whether EPEI waived its immunity from suit pursuant to the waiver provided by TEX. LOC. GOV'T CODE ANN. § 271.152.

*Applicable Law: Chapter 271's Waiver of Immunity*

Texas Local Government Code Section 271.152 waives governmental immunity from suit

for certain breach of contract claims stated as follows:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE ANN. § 271.152. Under a plain reading of Section 271.152, three elements must be established to waive the government's immunity from suit: (1) the party against whom the waiver is asserted must be a "local governmental entity" under Section 271.151(3); (2) the entity must be authorized by statute or the Constitution to enter into contracts; and (3) the entity must in fact have entered into a contract that is "subject to this subchapter," as defined by Section 271.151(2). *Id.* §§ 271.151–.152; *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011); *JNC Land*, 479 S.W.3d at 908. When these three elements are satisfied, the governmental entity's immunity is waived from suit for breach of contract and a court has subject matter jurisdiction to "adjudicat[e] a claim for breach of the contract." *Id.* § 271.152; *Williams*, 353 S.W.3d at 134. "Adjudicat[ing]" the claim includes bringing the contract claim to final judgment through either court or arbitration proceedings. *Id.* § 271.151(1).

As we previously stated, because EPEI is an open-enrollment charter school, it is deemed a local governmental entity for purposes of Section 271.152. Therefore, the first element required for a waiver of immunity has been satisfied. *EPEI I*, 385 S.W.3d at 706; *see also LTTS Charter Sch., Inc. v. C2 Const., Inc.*, 358 S.W.3d 725, 742 (Tex. App.—Dallas 2011, pet. denied) ("[w]e conclude an open-enrollment charter school is a 'local governmental entity' for purposes of section 271.152.").[3] Moreover, the parties do not dispute that the second requirement of Section 271.152 is satisfied; that is, EPEI is a governmental entity authorized to enter into contracts like the Lease

---

[3] For a more thorough discussion as to why an open-enrollment charter school is a governmental unit, see *El Paso Educ. Initiative, Inc. v. Amex Properties, LLC*, 385 S.W.3d 701, 706 (Tex. App.--El Paso 2012, pet. denied).

Agreement that is the subject of this suit. Thus, more narrowly, the parties here are disputing the third element, whether the Lease Agreement qualifies as a "contract subject to this chapter[.]" TEX. LOC. GOV'T CODE ANN. § 271.151.

Pursuant to Section 271.151, a "[c]ontract subject to this subchapter" is defined to mean:

[A] written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity[.]

TEX. LOC. GOV'T CODE ANN. § 271.151(2)(A). To qualify as a contract subject to Section 271.152's waiver of immunity, a contract must: (1) be in writing, (2) state the essential terms of the agreement, (3) provide for goods or services, (4) to the local governmental entity, and (5) be executed on behalf of the local governmental entity. *Id*.; *Williams,* 353 S.W.3d at 135; *JNC Land*, 479 S.W.3d at 908. Here, the parties raise a dispute on whether the Lease Agreement was properly executed on behalf of EPEI.

**Issue One: Proper Execution Under Section 271.151**

In its first issue, EPEI argues that because the purported contract between it and Amex was not "properly executed" within the meaning of TEX. LOC. GOV'T CODE ANN. § 271.151(2), EPEI's immunity was not waived and the trial court erred in denying its plea to the jurisdiction. Directing us to EPEI's charter and to provisions in the Texas Education Code and the Texas Administrative Code, EPEI argues that open-enrollment charter schools are governed by a board of directors, which in turn, are responsible for the management and operation of the charter school. EPEI further argues that while open-enrollment charter schools may delegate contracting authority to an individual officer, they must specify that delegation in their charter through a delegation amendment or, alternatively, that a contract requires board approval.

*Law-of-the-Case Doctrine Does Not Apply*

9

As a preliminary matter, we first address our prior opinion arising from this suit. Amex points to our opinion issued during a previous interlocutory appeal to contend that we have already decided the issue being presented by EPEI at this juncture. *See EPEI I*, 385 S.W.3d at 701. We stated in the first appeal of this case that:

> Because the Lease Agreement executed by Burnham and Martinez is in writing, and because Burnham executed the Lease Agreement by signing it in her authorized capacity on behalf of the local governmental entity, EPEI, the first and fifth elements have been met. Because the Lease Agreement provides that Amex is leasing pad sites and will construct buildings thereon for the charter school's use, the third and fourth elements requiring that the contract provide goods and services to EPEI as a local governmental entity are met.

*Id.* at 706–07. After determining that "[t]he second element for establishing a contract subject to waiver" was met, we further concluded that because "EPEI entered into a contract that is subject to Subchapter I as defined by section 271.151(2), the Legislature has waived EPEI's immunity to suit for the purpose of adjudicating a breach-of-contract claim." *Id.* at 708.

In our previous opinion, however, the scope of our immunity inquiry did not include substantive analysis of whether the Lease Agreement was "properly executed" on behalf of EPEI. Thus, we find that EPEI raises a different issue in this appeal. *See Gilliam v. Santa Fe Indep. Sch. Dist.*, No. 01-14-00186-CV, 2016 WL 828055, at *4 (Tex. App.—Houston [1st Dist.] Mar. 3, 2016, no pet.) (mem. op.) ("[b]ecause the District raised a new jurisdictional issue that this Court did not consider in *Gilliam I,* the trial court was not constrained by the law-of-the-case doctrine and properly considered the District's Plea to the Jurisdiction."). When we concluded that the Lease Agreement satisfied the requirements of Section 271.152, we reviewed only terms of the Lease Agreement to determine if it satisfied the "essential terms of the agreement." *See EPEI I*, 385 S.W.3d 707. Importantly, we did not previously have the benefit of the additional evidence that the parties produced after the case resumed in the trial court such as the affidavits and

10

depositions we have in the record before us now. *Cf. Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex. 1986) (law-of-the-case doctrine "does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same" as those involved in the first proceeding).

To the extent our prior opinion could be read as encompassing a pronouncement on whether Amex raised an issue as to whether the Lease Agreement was properly executed on behalf of EPEI, we observe that the law-of-the-case doctrine is not an absolute bar to reconsideration of an issue. *See Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). Rather, we retain discretion to revisit the issue depending on the particular circumstances of the case, and we opt to do so here. *See id.*

*Statutory Text: Properly Executed on Behalf of*

We now turn to the meaning of the phrase "properly executed on behalf of" as it pertains to TEX. LOC. GOV'T CODE ANN. § 271.151(2). In construing the statute, our fundamental goal is to ascertain and give effect to the Legislature's intent. *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012). To do this, we look to and rely on the plain meaning of a statute's words as expressing legislative intent unless a different meaning is supplied, it is apparent from the context, or the plain meaning of the words leads to absurd or nonsensical results. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 389–90 (Tex. 2014). "To determine a statutory term's common, ordinary meaning, we typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Texas State Bd. of Examiners of Marriage & Family Therapists v. Texas Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017). "It is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or

11

inoperative." *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex. 2003) (citing *Spence v. Fenchler*, 107 Tex. 443, 456, 180 S.W. 597, 601 (1915); *see also* TEX. GOV'T CODE ANN. § 311.021(2). That is, "every word in a statute is presumed to have been used for a purpose; and a cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible." *Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.* 35 S.W.3d 591, 593 (Tex. 2000).

Section 271.151(2) does not define the phrase "properly executed." *See* TEX. LOC. GOV'T CODE ANN. § 271.151(2). The common meaning of the term "properly" is "suitably, fitly, rightly, [or] correctly[.]" *Webster's Third New International Dictionary* 1818 (2002). Likewise, the common meaning of the term "execute," when used in the context of a legal instrument, is to "complete[, or] perform what is required to give validity to (as by signing and perhaps sealing and delivering)[.]" *Id.* at 794; *see also Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.,* 323 S.W.3d 151, 157 (Tex. 2010) (per curiam) (noting "'execute'" means "'[t]o perform or complete (a contract or duty) . . . [or][t]o make (a legal document) valid by signing; to bring (a legal document) into its final, legally enforceable form'") (quoting *Black's Law Dictionary* (8th ed. 2004)). The common meaning of the phrase "on behalf of" is "in the interest of, as the representative of, [or] for the benefit of[.]" *Webster's Third New International Dictionary* 198. As related to a contract, these terms together convey the meaning that a contract is "properly executed on behalf of" to mean that a contract is signed by a representative in accordance with the requirements for making it valid. *See Hous. Auth. of City of Dallas v. Killingsworth*, 331 S.W.3d 806, 810-11 (Tex. App.—Dallas 2011, pet. denied).

*Statutory Text: Properly Executed*

We note that Section 271.151(2)(A) does not state that the contract must be properly

12

executed *by* the local governmental entity; but instead, it requires that a written agreement be "properly executed *on behalf of* the local governmental entity." *See* TEX. LOC. GOV'T CODE ANN. § 271.151(2)(A) (emphasis added). Moreover, the statute also does not require the contract to ultimately be binding or enforceable. *See id.* Based on the plain text, we construe the phrase "properly executed" as referring to the discrete requirements or procedures which are outlined in the relevant statutes, ordinances, charters, or other documents governing the entity and allowing it to enter into contractual agreements. We further construe the phrase "on behalf of" to indicate that the local governmental entity will act through its authorized representative.

*Case Law: Properly Executed*

In support of its contention that the contract here was not "properly executed," EPEI cites *LTTS Charter Sch., Inc. v. C2 Const., Inc.*, an opinion from the Dallas court of appeals that it contends is on point. *LTTS Charter Sch., Inc. v. C2 Const., Inc.*, 358 S.W.3d 725, 730 (Tex. App.—Dallas 2011, pet. denied). *LTTS Charter* involved a construction contractor's claim against LTTS, an open-enrollment charter school, based on the retention of the contractor to construct school facilities. *LTTS Charter,* 358 S.W.3d at 730. LTTS's board passed a motion authorizing "the process of securing an appropriate facility" for a new school and specifically authorized its administrative director to select a contractor to construct facilities and "negotiate with [the contractor] concerning the scope of the Project." *Id*. at 743. The board did not pass any other motion relating to the project, and the court found that, in the absence of a motion passed by the charter school's board approving an agreement, the purported agreement was not "properly executed" under Section 271.151 of the Texas Local Government Code. *Id*. at 744. The court noted that the "record reflects there is no dispute that, in fact, no written contract was signed by [LTTS]." *Id*. at 742, and thereafter distinguished *City of Houston v. Clear Channel Outdoor, Inc.*,

13

233 S.W.3d 441, 446-47 (Tex. App.—Houston [14th Dist.] 2007, no pet.) on the lack of a motion to the board. *Id*. at 744; *see Vantage Sys. Design, Inc. v. Raymondville Indep. Sch. Dist.,* 290 S.W.3d 312, 316 (Tex. App.—Corpus Christi 2009, pet. denied) (finding that the agreement at issue was not "properly executed" on behalf of the local governmental entity where a written contract was never presented to the court). A crucial distinction that EPEI overlooks, however, is that unlike *LTTS*, where the record did not reveal any written contract, the record here undisputedly includes a written, signed contract by its representative.

In response, Amex relies on case law to contend that "whether or not [EPEI] has waived [its] governmental immunity does not depend on whether the Lease [Agreement] is ultimately binding upon [EPEI], but only whether the Lease was 'properly executed.'" In *Clear Channel Outdoor*, the City of Houston offered to purchase Clear Channel's billboard on property destined for a street repair project. *City of Houston v. Clear Channel Outdoor, Inc.*, 233 S.W.3d 441, 443 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The City delivered the Purchase Agreement, signed by a consultant to the City, "subject to City Council approval" and contingent on successful negotiation with the property owners. *Id.* The City passed a motion recommending condemnation of the property, including the billboard sign, and payment of the amount stated in the Purchase Agreement; however, the City later withdrew its offer to purchase the billboard sign. *Id*. at 444. Clear Channel sued the City for breach of contract under TEX. LOC. GOV'T CODE ANN. § 271.152, and in response the City filed a plea to the jurisdiction, asserting the contract for the billboard sign was not "properly executed" since it was not signed by the mayor and the controller, as required by the City's charter. *Id*. at 446.

Affirming the trial court's denial to the plea, the Houston court of appeals observed that another provision of the City's charter provided that the motion to condemn was "in full force and

14

effect" since the motion was the final step needed to complete the contract between the parties, and therefore satisfying the requirements of Section 271.151(2). *Id.* at 446–47; *see also City of Dallas v. Arredondo*, 415 S.W.3d 327, 349–50 (Tex. App.—Dallas 2013, pet. denied) (concluding that the trial court properly denied the city's plea to the jurisdiction where firefighters, employed by the city, presented a factual issue as to a "properly executed" unilateral contract under Section 271.152 where the "contract" was a city ordinance was ambiguous, approved by the city attorney, but not signed by the city manager). The court noted that the "City's contention that the signatures of the mayor and the city controller are required arguably conflates the issue of whether the contract is binding under the charter—a question that goes to the merits of the case—with the issue of whether it was properly executed on the City's behalf." *Clear Channel Outdoor, Inc.*, 233 S.W.3d at 446. The court further noted "that Section 271.152 does not require that the contract at issue be properly executed by the governmental entity; rather, the requirements of the statute are satisfied if the contract was properly executed *on behalf of* the entity." *Id*. *Clear Channel* is factually distinguishable from this case since the contract at issue in *Clear Channel* was signed by a consultant to the City and the City Council there passed a motion recommending that the City be authorized to condemn the billboard. *Id*. at 443. In the present case, however, the contract is signed by Burnham, an EPEI board member and superintendent of schools.

We find more persuasive guidance from the *Killingsworth* line of cases. There, Killingsworth sued the Housing Authority of the City of Dallas (DHA) for breach of a written CEO employment contract under Section 271.152 of the Texas Local Government Code. *Hous. Auth. of City of Dallas v. Killingsworth*, 331 S.W.3d 806, 808 (Tex. App.—Dallas 2011, pet. denied) (*Killingsworth I*); *Killingsworth v. Hous. Auth. of City of Dallas*, 447 S.W.3d 480, 490 (Tex. App.—Dallas 2014, pet. denied) (*Killingsworth II*). In *Killingsworth*, the contract at issue

15

had been signed by the chairman of the DHA board—who had authority to sign pursuant to the DHA's bylaws—and the board's vote in executive session authorizing the contract were publicly admitted in the meeting minutes. *Killingsworth I*, 331 S.W.3d at 808. In its first plea to the jurisdiction, DHA argued that the board never approved the employment contract, and therefore, the contract was not properly executed, and if it was approved as Killingsworth alleged, it would be in violation of the Texas Open Meetings Act and still would not be properly executed. *Id*. at 809; *see also* TEX. GOV'T CODE ANN. §§ 551.001–.056. The trial court denied DHA's plea to the jurisdiction. *Id*. Reviewing the phrase "properly executed," the Dallas court of appeals first turned to the plain and common meaning of these words. *Id*. at 811. The court analyzed the meaning of the phrase as used in the Local Government Code and determined that based on the language of the statute, the focus of the statute is whether the DHA had the authority to enter into the contract. *Id.* at 811–12. The court construed the phrase as referring to the requirements or procedures outlined in the relevant statutes, ordinances, or other documents that give the DHA the authority to enter into a contract. *Id.* at 812. Reviewing the jurisdictional evidence in the first appeal, the court determined that:

> The evidence before us—the by-laws granting the commissioners power to employ a CEO and the chairman the authority to sign contracts, the board minutes confirming [the chairman] had the board's permission to effectuate a CEO contract and the references to a decision related to the CEO position, as well as the chairman's signature and delivery of an employment contract to Killingsworth—is more than a scintilla of evidence to show the contract was "properly executed" on behalf of the DHA. Thus, indulging every reasonable inference and resolving any doubts in Killingsworth's favor, we conclude Killingsworth raised a jurisdictional fact question as to whether the contract was properly executed. *Id*. at 814.

The trial court granted a summary judgment motion in favor of DHA, and on the case's second appeal, the Dallas court of appeals turned to the contract language to determine whether Section 271.152's requirements were satisfied. *Killingsworth II*, 447 S.W.3d at 488. The court

16

determined that the language of the contract stated, "that its terms [were] nonbinding unless it is signed by the DHA Board Chairman and approved by the DHA Board." *Id.* Applying principles of contract interpretation, the court found that the purported contract required subsequent approval by the Board, reasoning:

> We read this sentence as a signal that something else has to happen after the agreement is presented to Killingsworth before the parties are bound by this agreement, namely [the chairman] has to sign the agreement and the Board has to approve it. And because we presume the parties intended these conditions to have some effect, we cannot interpret the agreement in the manner suggested by Killingsworth—as not requiring Board approval after it was presented to him—without rendering this sentence meaningless. *Id.*

Here, Amex relies only on *Killingsworth I*; however, we find guidance from both *Killingsworth I* and *II*. In *Killingsworth I*, the court relied on the local governmental entity's by-laws, board minutes, the CEO's signature, and delivery of the contract, to find there was more than a scintilla of evidence demonstrating the contract was properly executed on behalf of the local governmental entity. *Killingsworth I*, 331 S.W.3d at 814. In *Killingsworth II*, the court turned to the language of the contract to determine that a valid contract did not exist. *Killingsworth II*, 447 S.W.3d at 491. Notably, the court distinguished the procedural and factual posture to find that the law-of-the-case doctrine was inapplicable. *Id.* at 490–91. The court reasoned that in *Killingworth I*, it did not review the purported agreement itself nor deposition testimony of DHA's board members suggesting that Killingsworth was aware that the agreement required the ratification of the board. *Id.* at 491.

*Analysis*

We now consider whether the purported contract between EPEI and Amex was "properly executed" within the meaning of Section 271.151(2)(A). EPEI challenges the existence of Amex's jurisdictional facts and argues the evidence controverts Amex's factual allegations that the Lease

17

Agreement was "properly executed." Specifically, EPEI directs us to sections in the Texas Administrative Code to argue that the EPEI board did not pass a delegation amendment to its charter, which would have to be approved by the Commissioner of Education, to bind the charter school to the Lease Agreement. 19 TEX. ADMIN. CODE § 100.1101(c) ("[a]n open-enrollment charter must specify the powers or duties of the governing body of the charter holder that the governing body may delegate to an officer . . . or any other person."). We believe that this argument conflates the issue of whether the contract is binding under the law applicable to the charter school—a question that goes to the merits of the case—with the issue of whether it was "properly executed" on EPEI's behalf.[4]

In response, Amex directs us to the provisions in the Lease Agreement that Burnham and Martinez signed, including the certificates of acknowledgement, the email sent from Wallace to Perez, and two other provisions in EPEI's charter to argue that Burnham properly executed the Lease Agreement on behalf of EPEI. The first charter provision Amex directs us to is titled "Indebtedness of Charter," which states:

> Charterholder shall not incur a debt, secure an obligation, extend credit, or otherwise make use of the credit or assets of the charter school for any purpose other than operation of the charter school[.]

The second charter provision is titled Charter School Facility, and states:

> Charterholder shall have and maintain throughout the term of the charter a lease agreement, title or other legal instrument granting to Charterholder the right to occupy and use one or more facilities suitable for use as the charter school facilities described by the charter. During any period of dormancy granted by the Board, this requirement may be waived by the Board.

> In short, the jurisdictional evidence before us relevant to the issue of proper execution

---

[4] EPEI does not argue that Burnham lacked actual or apparent authority to sign the Lease Agreement.

consists of (1) the Lease Agreement; (2) the charter and charter amendments of the charter school; (3) a series of emails sent between parties on both sides around April and May of 2008; (4) the EPEI board minutes from the January 28, April 1, and May 28, 2008 meetings; (5) a deposition of Silvia Martinez; (6) an affidavit from Iris Burnham; and (7) an affidavit from Jerry Wallace. EPEI's charter contains Burnham's signature and a provision stating that the charter holder, Burnham Wood Charter Schools, "represents that the person signing this contract has been properly delegated authority to do so." In addition, the charter contains a provision allowing EPEI to incur financial obligations for operations of the charter school and another provision requiring, with an exception not relevant here, that it maintain a lease during the charter school's term.

By its terms, the Lease Agreement does not contain language requiring board approval for the contract to become effective; it only requires the signature of Iris Burnham, President of EPEI. It states that the person "executing" the Lease Agreement "personally represents and warrants that [she] is duly authorized . . . and that this Lease [Agreement] is binding upon the entity in accordance with its terms." Additionally, the Lease Agreement states that it "becomes effective as a Lease only upon execution and delivery thereof by Landlord to Tenant." The certificate of acknowledgement is acknowledged and states that "Iris Burnham, known to me [as] President of The El Paso Education Initiative, Inc., a Texas corporation, and the person whose name is subscribed to the foregoing Lease Agreement, and who acknowledged to me that she executed the instrument for the purposes and considerations therein expressed and *on behalf of* The El Paso Education Initiative, Inc." (emphasis added).

In her affidavit, Burnham does not deny that she signed the lease. Instead, she states that she did not believe that the negotiations with Amex and the school district had resulted in final agreed-upon lease terms. Burnham avers she did not present any lease with Amex Properties to

19

the Board of Directors for board approval. In his affidavit, Wallace states that no "individual," including himself and Burnham, "had the legal authority to bind" EPEI to a lease of real property and further states that it was his belief that the negotiations with Amex were unsuccessful. Wallace's email to Perez, however, suggested that Burnham and Martinez were to sign the Lease Agreement on behalf of EPEI and Amex. The board minutes at the April 1 meeting state that "Burnham asked the Board's permission to continue to negotiate a lease with Ms. Martinez," which the board approved, whereas the May 28 minutes state that the negotiations with Martinez where "unsuccessful." Lastly, the parties do not allege that Amex, as landlord, did not "execute and deliver" the lease to EPEI, the last step in satisfaction of the Lease Agreement's terms to effectuate the contract.

In sum, viewed in the light most favorable to Amex (as we must), the record shows that (1) EPEI's charter authorizes contracts, such as a lease; (2) the board's minutes purport to indicate that Burnham had at least some authority to enter into the Lease Agreement and that the board members were aware of Burnham's discussions with Amex; and (3) Amex delivered the Lease Agreement to EPEI in satisfaction of the contract's terms to finalize the agreement. Given the jurisdictional evidence presented by the parties, we conclude that the resolution of whether the Lease Agreement was "properly executed on behalf of" EPEI is an issue for the fact finder on remand, that EPEI did not satisfy its burden in negating the trial court's jurisdiction over the case, and that the trial court correctly denied EPEI's plea to the jurisdiction.

Thus, we conclude that EPEI's first issue is overruled.

### Issue Two: Consequential Damages under Chapter 271

In its second issue, EPEI argues that even if the Lease Agreement satisfies the fifth requirement that the contract be properly executed on behalf of EPEI within Section 271.152, the

20

trial court erred to the extent it denied the plea as to Amex's claim for consequential damages.

*Applicable Law: Chapter 271 & Consequential Damages*

Section 271.152 provides a limited waiver of immunity, and Section 271.153 places limits on recoverable damages when immunity from suit is waived. TEX. LOC. GOV'T CODE ANN. §§ 271.152–.153. Specifically, Section 271.152 provides that the limited waiver of immunity is subject to certain "terms and conditions." *See id.*; *Lubbock County Water Control & Imp. Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 301 (Tex. 2014). One of the "terms and conditions" is found in Section 271.153 of the Local Government Code, which sets out the types of damages available to a party in an action pursuant to Section 271.152. *See* TEX. LOC. GOV'T CODE ANN. § 271.153; *Zachry Const. Corp. v. Port of Houston Auth. of Harris Cty.*, 449 S.W.3d 98, 106 (Tex. 2014). For Section 271.152's waiver of immunity to apply, a party must claim damages within the limitations set out in Section 271.153 since "[Chapter 271] does not waive immunity from suit on a claim for damages not recoverable under Section 271.153." *Id.* at 110–11.

Under Section 271.153(a)(1), the "amount of money awarded . . . for breach of a contract" includes "the balance due and owed . . . under the contract" as amended, "including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays[.]" *See* TEX. LOC. GOV'T CODE ANN. § 271.153(a)(1); *Zachry*, 449 S.W.3d at 106. Section 271.153(b)(1) precludes recovery of consequential damages, "except as expressly allowed under Subsection (a)(1)." *See* TEX. LOC. GOV'T CODE ANN. § 271.153(b)(1); *Zachry*, 449 S.W.3d at 106.

*Analysis: Chapter 271 & Consequential Damages*

In its live pleadings, Amex alleges that it executed a contract with AbM Construction Co. (AbM) for construction of phase one under the Lease Agreement. Amex alleges that it materially altered its position under the contract with AbM by ceasing construction because of EPEI's breach

21

of the Lease Agreement and claims it is entitled to recover "consequential damages flowing from [EPEI]'s actions that affect Amex's contract with AbM[.]"

In response, EPEI contends that the consequential damages claimed by Amex are precluded under Section 271.153(b). Specifically, EPEI argues that any "consequential damages" Amex may have incurred in connection with the AbM contract are not "the balance due and owed" under the Lease Agreement and are not "increased cost to perform the work as a direct result of owner-caused delays or acceleration[.]" *See* TEX. LOC. GOV'T ANN. § 271.153(a)(1).

Amex recognizes that consequential damages beyond those stated in Chapter 271 are not recoverable but contends that whether Amex's specific claims for damages are "direct" or "consequential" must be determined by the trial court after an analysis of the contract, the parties' expectancy, and the bargain between them. Alternatively, Amex points to the provisions in the Lease Agreement contemplating these damages to argue that immunity was waived for these types of damages as they are direct damages.

We disagree with Amex to the extent it contends that we may not determine, at this stage of the proceedings, if the damages Amex pleaded preclude a finding of whether immunity was waived. The Local Governmental Code Contract Claims Act "waives immunity for contract claims that meet certain conditions: the existence of a specific type of contract, a demand for certain kinds of damages, a state forum, etc." and "Section 271.152 uses Section 271.153 to further define to what extent immunity has been waived." *Zachry*, 449 S.W.3d at 109–10. The waiver under Chapter 271 "does not depend on the outcome" or "ultimate liability," but "it does require a showing of a substantial claim that meets the Act's conditions." *Id.* at 109. "Substantial" in this context means that the "claimant must plead facts with some evidentiary support that constitute a claim for which immunity is waived," and does "not [require a showing] that the claimant will

22

prevail." *Id*. at 110. We conclude that Amex satisfied its burden.

The complained of damages are the costs that arose from Amex's contract with AbM, which were a result of EPEI's alleged breach of the Lease Agreement. Amex directs us to the relevant portions of the Lease Agreement it believes addresses these damages. These sections are:

> 3.01. Commencement Date and Obligation to Pay Rent. . . . Tenant shall pay any and all costs and expenses incurred by Landlord which result from any Tenant Delay, including, without limitation, any and all costs and expenses attributable to increases in the cost of labor or materials. A 'Tenant Delay' means any delay that Landlord may encounter in the performance of Landlord's obligations under the Lease because of any act or omission directly attributable to Tenant or its agents, affiliates or contractors, . . .;
>
> 8.01.2. Plan Changes. . . . (b)Tenant shall pay directly to Landlord's contractor the net reasonable additional third-party costs of the Work resulting from the Changes.";
>
> 22.01. Default by Tenant. Upon the occurrence of any of the following events, Tenant shall be deemed to be in default under the terms of this Lease. . . . (b) Tenant violates *any* requirements or covenants of this Lease[.] (emphasis added);
>
> 22.02. Landlord's Remedies. Upon the occurrence of any of the events set forth in Section 22.01 . . . (c) Landlord may collect by suit or otherwise, without reletting the Leased Premises, each installment of rent *or other sum* as it becomes due hereunder, or enforce, by suit or otherwise, *any other covenant or obligation which is required to be performed by Tenant. Landlord may also elect to cure any default on behalf of Tenant and, in such event, Tenant shall immediately reimburse Landlord for the costs so incurred*. (emphasis added).

The Texas Supreme Court in *Zachry* held that Chapter 271 "waives immunity for a contract claim for delay damages *not expressly provided for in the contract*." *Zachry*, 449 S.W.3d at 114 (emphasis added). The Court explained that the phrase the "balance due and owed under the contract" means "the amount of damages for breach of contract payable and unpaid." *Id*. at 111 (internal ellipsis omitted). Likewise, the Court stated that "[n]othing in the [Act] suggests that recoverable damages must be stated in the contract." *Id*. at 112.

EPEI directs us to a Texas Supreme Court opinion to argue that EPEI retains its immunity

with regard to these damages; however, EPEI's reliance is misplaced. In *Sharyland*, the contractor, the Sharyland Water Supply Corporation, sought to recover its "increased cost to perform" its contractual duty under a Water Supply Agreement with the City of Alton to repair and maintain a water system. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 409, 412 (Tex. 2011). The City of Alton had contracted with several third parties to build a sanitary sewer system which the third parties installed near the water system Sharyland contracted to repair and maintain. *Id*. at 410. Alleging that Sharyland suffered significant injury because Alton's sanitary sewer system was negligently installed in violation of state regulations and industry standards, Sharyland sued the City of Alton alleging it had breached the Water Supply Agreement. *Id*. Sharyland also sued the third-party contractors for negligence and breach of contract, contending Sharyland was a third-party beneficiary of the agreement with the City of Alton. *Id*. at 410-11. Affirming the decision of the Corpus Christi court of appeals, the Texas Supreme Court found that, under a plain reading of the statute, Sharyland could not recover against the City of Alton the costs to repair its system, as they were not a "balance due and owed" under the contract, they were not the direct result of owner-caused delays or acceleration, and were the amount owed for change order or additional work the contractor was directed to perform by the local governmental entity in connection with the contract. *Id*. at 412–13 (quotation marks omitted); *see also* TEX. LOC. GOV'T CODE ANN. § 271.153.

We find at least two notable differences between *Sharyland* and this case. First, as pointed out by Amex, the Lease Agreement perceivably includes at least some of the costs Amex alleges with regard to the AbM agreement. Second, EPEI did not contract with AbM in the same manner that the City of Alton contracted with third parties; rather, AbM contracted with Amex. As alleged by Amex, the Lease Agreement may in fact encompass costs associated with the AbM agreement.

24

A review of a different Texas Supreme Court decision will help to further illustrate these distinctions.

In *Kirby*, developers sued an area water authority for reimbursement of part of their costs of building water and sewer facilities, which the authority had agreed to pay out of a pool of voter-approved bonds. *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 833–34 (Tex. 2010). While the bonds had not been approved, the developers claimed that the Water Authority breached the contract by campaigning against approval, thereby obviating the authority's reimbursement obligation. *Id*. at 834 (re 2006 bond election); *see also Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.,* 321 S.W.3d 1, 5 (Tex. App.—Houston [14th Dist.] 2008) ("*Kirby III* "), *aff'd,* 320 S.W.3d 829, 843–44 (Tex. 2010). The Water Authority contended that nothing was "due and owed" under Section 271.153(a)(1), in part, because its obligation to reimburse the developers had not been triggered as no bonds had been approved. *Id*. at 839–40. It was this reason for which the Water Authority argued that immunity was not waived. *Id*. Stated differently, the Water Authority argued that *because* there was no liability, there were no recoverable damages and, therefore, no waiver of immunity. But the premise of no liability was itself disputed, and if the Water Authority had breached the contract by opposing bond approval, then the developers claimed only the reimbursement under the contract as damages. These damages, the Court held, were "due and owed" under Section 271.153(a)(1). *Id*. Explaining, the Court stated, "[t]he purpose of section 271.153 is to limit the amount due by a governmental agency on a contract once liability *has been established*, not to foreclose the determination of whether liability exists." *Id*. at 840 (emphasis added).

Based on the limited record before us and viewing the language of the Lease Agreement in the light most favorable to Amex, the Lease Agreement appears to provide for at least some of the

25

damages pertaining to the agreement with AbM. EPEI agreed to "pay directly to" Amex's "contractor the net reasonable additional third-party costs[.]" The Lease Agreement provides that EPEI will reimburse Amex when Amex "cure[s] any default on behalf of" EPEI, defining "default," in part, as a violation of any requirement or covenant of the Lease Agreement. EPEI also agreed to "pay any and all costs and expenses" attributable to EPEI's delays. In her deposition, Martinez explained that construction pursuant to the lease negotiations commenced before the parties signed the Lease Agreement. The record before us also includes two invoices from AbM: one dated May 1, 2008, for an amount due of $265,542.47 and one dated May 25, 2008, for an amount due of $362,562.47. Thus, viewed in the light most favorable to Amex, we find that Amex alleged recoverable damages and produced some evidence to establish it incurred damages that fit within the contract at issue as well as "under the contract" as provided in Section 271.153.

We understand EPEI to argue that immunity is not waived for the damages Amex alleges with regard to AbM. But, as in *Kirby*, the "no liability" argument is itself disputed as the parties need to first establish that a contract was properly formed under Section 271.152.[5] If EPEI is found to have breached the Lease Agreement, then a claim of reimbursement under the contract may be "due and owed" under Section 271.153(a)(1) and therefore constitute recoverable damages. This presents a fact issue as to whether the damages claimed by Amex are direct or consequential, and the trial court did not err in denying Amex's plea to the jurisdiction on the issue of consequential damages flowing from Amex's breach of contract claim.

EPEI's second issue is overruled.

---

[5] The parties here argue over the formation of a contract under the Local Government Code, not whether EPEI did indeed breach the Lease Agreement.

26

**Issue Three:  Attorney's Fees**

In its live pleadings, Amex alleges that it is entitled to attorney's fees.  On appeal, EPEI contends that the attorney's fees claimed by Amex are precluded under the pre-2009 version of TEX. LOC. GOV'T CODE ANN. § 271.153(b), which prevented recovery of attorney's fees.  In its brief, Amex concedes that, under TEX. LOC. GOV'T CODE ANN. § 271.153(b) applicable at the time the Lease was executed, Amex is not entitled to recover attorney's fees.  Our investigation of this statute and its legislative history yields the same result:  attorney's fees related to contractual suits for agreements executed prior to the 2009 amendment of Section 271.153(b) are not recoverable because the amendment did not apply retroactively to those contracts.  *See* Act of May 31, 2009, 81st Leg., R.S., ch. 1266, § 8, 2009 TEX. GEN. LAWS 4006, 4007; *Sharyland*, 354 S.W.3d at 412 n.5.

Here, the parties do not dispute that the alleged contract between EPEI and Amex was entered into in 2008, or prior to the 2009 amendment of Section 271.153(b).  Since the 2009 amendment does not apply retroactively to contracts dated beforehand, and the pre-2009 version of Section 271.153(b) did not allow for recovery of attorney's fees, Amex is precluded from recovering attorney's fees related to its contract with EPEI.

EPEI's third issue is sustained.

**CONCLUSION**

Having overruled EPEI's first and second issues, we affirm the trial court's order denying EPEI's plea to the jurisdiction as to Amex's breach of contract claim and its claim for consequential damages.  Having sustained EPEI's third issue, we reverse the trial court's order denying EPEI's plea to the jurisdiction as to Amex's claim for attorney's fees and render judgment granting the plea to the jurisdiction as to Amex's claim for attorney's fees.

27

GINA M. PALAFOX, Justice

October 31, 2018

Before McClure, C.J., Rodriguez, and Palafox, JJ.