COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

THE EL PASO EDUCATION
INITIATIVE, INC., D/B/A BURNHAM
WOOD CHARTER SCHOOL,

§

§

No. 08-11-00378-CV

Appeal from the

§

Appellant,

§

County Court at Law Number Six

v.

§

of El Paso County, Texas

AMEX PROPERTIES, LLC,

§

(TC#2008-2370)

§

Appellee.

## **O P I N I O N**

Appellant, the El Paso Education Initiative, Inc. (EPEI) which does business as Burnham Wood Charter School (the charter school) appeals the trial court's denial of its plea to the jurisdiction in which EPEI asserted that it is immune from the breach-of-contract suit filed by Appellee, Amex Properties, LLC (Amex). We affirm the trial court's order.

## BACKGROUND

In 2008, EPEI sought to open an open-enrollment charter school in east El Paso. EPEI then began negotiations with Amex to lease its property at 1441 North Zaragosa Road for the operation of Vista Del Futuro Charter School.

According to EPEI, the president of the charter school, Iris Burnham, signed a proposed first lease offer and sent it to Amex's manager, Silvia Martinez Aguirre (Martinez), who did not agree with its terms. Negotiations then continued, with Martinez revising the penalty for not meeting the occupancy date.

On or about April 24, 2008, Burnham received from EPEI's attorney Jerry Wallace, a lease document that incorporated changes made to a prior version of the lease document. Burnham

then signed and transmitted the document to Martinez. Late in the day on Friday, April 25, 2008, without consulting Amex's attorney Victor Firth, Martinez took the Lease Agreement to her bank to sign it before a notary public.

The twenty-four-page document, titled "Lease Agreement," bears the signature of Martinez as Manager of landlord Amex Properties, LLC, the signature of Burnham as President of tenant the EPEI, and the recital, "Executed as of 17 April 2008." Contained within the Lease Agreement are two notarized certificates of acknowledgement. A certificate acknowledging Burnham's signature was signed by a notary public on April 24, 2008, and states that Burnham, as President of EPEI, had appeared and acknowledged that she had executed the Lease Agreement "for the purposes and considerations therein expressed" on behalf of EPEI. The certificate acknowledging Martinez's signature was signed the following day, on April 25, 2008, by a notary public who states therein that Martinez, as Manager of Amex, appeared and acknowledged that Martinez had executed the Lease Agreement "for the purposes and considerations therein expressed" on behalf of Amex.

Section 31.09 (Entire Agreement) of the Lease Agreement signed by Burnham and Martinez specifies that "Submission of this Lease for examination does not constitute an option for the Leased Premises and becomes effective as a Lease only upon execution and delivery thereof by Landlord to Tenant." On either Friday, April 25, 2008 or the following Monday, April 28, 2008, Martinez verbally informed the charter school's general administrator, Rebeca Perez, and its realtor, Juan Uribe, that she had executed the written Lease Agreement.

Unaware that Amex and the charter school had executed a lease document, Firth had continued working on the lease document on Sunday, April 27, 2008. That same day, Firth sent

2

an email to EPEI's attorney Wallace, in which Firth set forth Amex's "responses to your revisions to my initial lease draft," expressed a hope that the parties could reach agreement "along these lines," requested Wallace to refrain from making other revisions without speaking with him, identified as the "major issue" Amex's proposed revision regarding a reduction of deposit as the sole relief for a delayed completion date, noted his concern that it would be difficult to meet the completion date "[i]f the parties cannot reach terms," and stated that his hope was that "we can get things in a position for the parties to sign as early as possible this week."   In his deposition, Firth later explained that when he sent the email on Sunday, he had intended that it be a rejection of the charter school's most recent proposal and had not known at that time that the parties had already "made their deal" or had signed the agreement.

The following day, April 28, 2008, Wallace and Firth spoke by phone.   At the time, neither Wallace nor Firth was aware of the fact that Burnham and Martinez had signed or executed any documents.   In his deposition, Wallace stated that he considered Firth's email to be a counteroffer.   Later that day or early on Tuesday, April 29, 2008, Firth learned that Martinez had signed a lease agreement on the preceding Friday, April 25, 2008.   As soon as Firth learned that Burnham and Martinez had signed the Lease Agreement, he informed Wallace of that fact and told Wallace that because their clients had "made their deal," a contract had been formed and the parties would need to address their remaining concerns in an amendment to the executed Lease Agreement.[1]

On April 29, 2008, Wallace informed Firth by email that the charter school was formally withdrawing its counteroffers and rejected all offers and counteroffers submitted by Amex as the

---

[1] Firth and Wallace disagree about the specific date on which Firth then verbally informed Wallace that their clients had signed a lease despite ongoing negotiations, but the evidence is consistent with a date following soon after the weekend of April 26-27, 2008.

charter school no longer desired to lease property from Amex. Firth sent an email reply asking Wallace to explain the impasse. On May 1, 2008, Wallace sent another email to Firth stating that the charter school had rejected Amex's counteroffers, noting Amex's desire to meet Burnham's terms regarding the lease, and setting forth Burnham's terms regarding occupancy, rental, deposit, space and other requirements. That same day, Firth informed Wallace that he had confirmed that Martinez had signed the Lease Agreement on April 25, 2008. On May 5, Martinez faxed to Wallace the Lease Agreement signed by Martinez and Burnham.

On June 16, 2008, Amex filed a breach-of-contract suit for anticipatory breach of contract after receiving notice from Burnham's attorney, Jerry Wallace, that Burnham rejected the lease and rejected any assertion that a valid lease existed. The charter school filed a plea to the jurisdiction contending that although it had submitted an offer to Amex in the form of a final, signed lease contract, because Amex did not communicate its acceptance of the offer after signing the lease document but, instead, allegedly had rejected the offer and had attempted to negotiate more favorable terms, and because the charter school had rejected all of Amex's counteroffers, no enforceable contract had been formed. The charter school asserted that, absent an enforceable contract, it is immune from suit as a matter of law and its plea to the jurisdiction should be granted.

The trial court denied the charter school's plea to the jurisdiction, and EPEI filed this interlocutory appeal.

### STANDARD OF REVIEW

The existence of a trial court's subject-matter jurisdiction is a question of law reviewed *de novo*. *Texas Dep't of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 226, 228 (Tex. 2004); *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). When a plea to

4

the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *Miranda*, 133 S.W.3d at 227; *see Bland Ind. School Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

When the jurisdictional challenge implicates the merits of the plaintiff's cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists. *Miranda*, 133 S.W.3d at 227. If a fact question regarding the jurisdictional issue is created by the evidence, the trial court cannot grant the plea to the jurisdiction and the fact issue will be resolved by the fact finder. *Id.* at 227-28. When the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

This standard generally mirrors that of a summary judgment under Rule 166a(c) of the Rules of Civil Procedure. TEX. R. CIV. P. 166a(c); *Miranda*, 133 S.W.3d at 228; *El Paso Community College Dist. v. Chase*, 355 S.W.3d 164, 166-67 (Tex.App.–El Paso 2011, pet. denied). Consequently, when the facts underlying the merits are intertwined with the trial court's subject-matter jurisdiction, a plaintiff is required to show that there is a disputed material fact regarding the trial court's jurisdiction once a government defendant has asserted and has supported with evidence its assertion that the trial court is without subject-matter jurisdiction. *Miranda*, 133 S.W.3d at 228; *Chase*, 355 S.W.3d at 167. "When reviewing a plea to the jurisdiction in which the pleading requirement has been met and evidence has been submitted to support the plea that implicates the merits of the case, we take as true all evidence favorable to the nonmovant" and "we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Miranda*,

5

133 S.W.3d at 228; *see also City of Waco v. Kirwan*, 298 S.W.3d 618, 622 (Tex. 2009).

## DISCUSSION

Section 271.152 of the Local Government Code provides that a local governmental entity that is authorized by statute or the constitution to enter into a contract and does enter into a contract subject to Subchapter I (Adjudication of Claims Arising Under Written Contracts with Local Governmental Entities) waives its immunity to suit for the purpose of adjudicating a breach-of-contract claim subject to the provisions of Chapter 271, Subchapter I. TEX. LOC. GOV'T CODE ANN. § 271.152 (West 2005). The term "local governmental entity" includes a public school district.[2] TEX. LOC. GOV'T CODE ANN. § 271.151(3)(B) (West 2005). In 2011, the Texas Supreme Court concluded that an open-enrollment charter school is also a "local governmental entity" for Texas Tort Claims Act purposes. *LTTS Charter School v. C2 Const. Inc.*, 342 S.W.3d 73, 82 (Tex. 2011). Our sister court thereafter concluded that an open-enrollment charter school is a local governmental entity for purposes of Section 271.152. *LTTS Charter School v. C2 Construction, Inc.*, 358 S.W.3d 725, 742 (Tex.App.—Dallas 2011, pet. filed). We also conclude that EPEI is a local governmental entity for such purposes. A contract subject to Subchapter I means "a written contract stating the essential terms of the agreement for

---

[2] The Legislature has also conferred upon open-enrollment charter schools the status of a governmental entity for purposes of Government Code Chapter 2252, Subchapter D (Real Property Held in Trust) and of Local Government Code Chapter 271, Subchapter B (Competitive Bidding on Certain Public Works Contracts). *See* TEX. EDUC. CODE ANN. § 12.1053(b) (West 2006); TEX. LOC. GOV'T CODE ANN. § 271.152 (West 2005). The Legislature has similarly conferred upon open-enrollment charter schools the status of a political subdivision for purposes of Government Code Chapter 2254, Subchapter A (Professional Services) and the status of a local government for purposes of Government Code Sections 2256.009 through 2256.016 (Authorized Investments for Governmental Entities). *See* TEX. EDUC. CODE ANN. § 12.1053(b)(West 2006). Having found that an open-enrollment charter school qualifies as an "institution, agency, or organ of government" which derives its status and authority from legislative enactment, the Texas Supreme Court has determined that an open-enrollment charter school is a "governmental unit" as defined in Section 101.001(3)(D) of the Tort Claims Act and is permitted to take an interlocutory appeal from a trial court's denial of its plea to the jurisdiction pursuant to Section 51.014(a)(8) of the Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(8), 101.001(3)(D) (West Supp. 2012); *see also LTTS Charter School, Inc. v. C2 Construction, Inc.*, 342 S.W.3d 73, 74-75, 78 (Tex. 2011).

6

providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity.   TEX. LOC. GOV'T CODE ANN. § 271.151(2) (West 2005).

The Texas Supreme Court has determined that a party wishing to establish a local governmental entity's waiver of immunity to suit for breach of written contract under Section 271.152, must establish three elements:

> (1) the party against whom the waiver is asserted must be a "local governmental entity" as defined by Section 271.151(3), (2) the entity must be authorized by statute or the Constitution to enter into contracts, and (3) the entity must in fact have entered into a contract that is "subject to this subchapter," as defined by section 271.151(2).

*City of Houston v. Williams*, 353 S.W.3d 128, 134-35 (Tex. 2011).   Consequently, because an open-enrollment charter school is a local governmental entity for purposes of Section 271.152, the first waiver element also encompasses open-enrollment charter schools.   *See LTTS Charter School, Inc.*, 342 S.W.3d at 742.

In its sole issue, EPEI complains that the trial court erred in denying its plea to the jurisdiction because no enforceable lease contract was formed between the parties and, as a result, the charter school's governmental-entity immunity from suit remains intact.   EPEI contends that Amex has not established that EPEI in fact entered into a contract as defined by Section 271.152, the third *City of Houston* element.   TEX. LOC. GOV'T CODE ANN. §§ 271.151(2), 271.152 (West 2005); *City of Houston*, 353 S.W.3d at 134-35.

Amex concedes that, in the absence of a contract, EPEI, as an open-enrollment charter school, enjoys immunity from suit as a governmental entity.   However, Amex asserts that a valid contract between the parties was formed which waived the charter school's immunity, thus justifying the trial court's denial of the charter school's plea to the jurisdiction.   Amex

7

alternatively contends that, at a minimum, the parties' production of conflicting evidence regarding delivery and formation of the contract is sufficient to preclude the granting of the charter school's plea to the jurisdiction. *Miranda*, 133 S.W.3d at 227-28.

The five elements for establishing a contract subject to waiver under Section 271.152 are: "(1) the contract must be in writing, (2) state the essential terms of the agreement, (3) provide for goods or services, (4) to the local governmental entity, and (5) be executed on behalf of the local governmental entity." TEX. LOC. GOV'T CODE ANN. § 271.151(2) (West 2005); *City of Houston*, 353 S.W.3d at 135. Because the Lease Agreement executed by Burnham and Martinez is in writing, and because Burnham executed the Lease Agreement by signing it in her authorized capacity on behalf of the local governmental entity, EPEI, the first and fifth elements have been met. Because the Lease Agreement provides that Amex is leasing pad sites and will construct buildings thereon for the charter school's use, the third and fourth elements requiring that the contract provide goods and services to EPEI as a local governmental entity are met.

We next determine whether the second element, that the contract states the essential terms of the agreement, has been established. *City of Houston*, 353 S.W.3d at 135. EPEI contends that it is impossible to determine what the essential elements of the agreement would be due to the initials, interlineations, and question marks denoted on prior drafts of the document. EPEI also argues that acceptance, and thus the existence of a contract, could only occur when Amex executed and delivered this lease to EPEI. We disagree with EPEI's analysis.

The material terms of a contract are determined on an agreement-by-agreement basis. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992); *see also Southern v. Goetting*, 353 S.W.3d 295, 300 (Tex.App.–El Paso 2011, no pet.). The Lease

8

Agreement executed by Burnham and Martinez contains no initials, interlineations, quotation marks, or other markings that would indicate rejection of any of its provisions or indicate that a term has been left to future negotiations. Our review of the written, executed Lease Agreement shows that its terms are reasonably specific and certain, and no party directs us to any provisions therein that are not reasonably specific and certain.[3]

The Lease Agreement was first signed by Burnham on behalf of EPEI, was tendered to Martinez who accepted the Lease Agreement terms and signed the document. Moreover, EPEI's argument that Amex's alleged failure to comply with the delivery provision in Section 31.09 of the Lease Agreement constituted Amex's failure to accept the terms of EPEI's offer is without merit. Section 31.09 of the Lease Agreement did not require execution and delivery for the purpose of constituting an acceptance of an offer. Rather, that provision of the Lease Agreement specifies that the Lease Agreement is to become effective, rather than formed, upon the execution and delivery of the Lease Agreement by Amex to EPEI.

The second element for establishing a contract subject to waiver has been met. TEX.

---

[3] The Lease Agreement provisions specifically identify or address, among other provisions: (1) the leased premises; (2) square footage; (3) the buildings to be constructed thereon; (4) the initial ten-year term of the agreement; (5) rental rates per year; (6) tenant's tax obligations; (7) tenant's deposit and the potential forfeiture of all or a portion thereof under specified circumstances; (8) responsibility for securing permits and compliance with municipal building codes; (9) net lease; (10) various definitions; (11) construction obligations of landlord and tenant, preparation of construction plans and specifications, plan changes and payment of related costs resulting therefrom; (12) use of the premises for the purpose of conducting a public charter school; (13) the orderly and legal operation of the premises, including storage and removal trash and garbage, pest extermination; (14) arrangement of orderly transportation for students and restricting students from loitering or assembling in specified areas; (15) tenant's covenants regarding laws, waste, and nuisance; (16) provisions regarding signage, awnings, and roof; (17) maintenance by landlord and tenant and landlord's right to cure; (18) provisions regarding alterations, additions, and improvements to the lease premises; (19) rights and obligations in relation to the filing of mechanic's or materialman's liens; (20) utility responsibilities; (21) common use areas; (22) assignment; (23) indemnity and release; (24) insurance; (25) destruction; (26) condemnation; (27) default, remedies, bankruptcy, and insolvency; (28) access to leased premises; (29) subordination; (30) attornment; (31) mortgagee protection; (32) quiet enjoyment; (33) surrender of premises; (34) holding over; (35) attorney's fees; (36) no existence or creation of partnership; (37) force majeure; (38) notices; (39) memorandum of lease for filing; (40) partial invalidity; (41) broker's commission; (42) successors and assigns; (43) entire agreement; (44) recourse by tenant; (45) security interest; (46) measurement approximations; (47) right of first refusal; and (48) authority of signatories.

LOC. GOV'T CODE ANN. § 271.151(2) (West 2005); *City of Houston*, 353 S.W.3d at 135. Consequently, because EPEI entered into a contract that is subject to Subchapter I as defined by section 271.151(2), the Legislature has waived EPEI's immunity to suit for the purpose of adjudicating a breach-of-contract claim. TEX. LOC. GOV'T CODE ANN. §§ 271.151(2), 271.152 (West 2005); *City of Houston*, 353 S.W.3d at 134-35; *Miranda*, 133 S.W.3d at 227-28; *LTTS Charter School*, 358 S.W.3d at 742. Issue One is overruled.

## CONCLUSION

The trial court's order denying the plea to the jurisdiction is affirmed.


GUADALUPE RIVERA, Justice

October 31, 2012

Before McClure, C.J., Rivera, J., and Antcliff, J.

10