FILED
18-1167
5/22/2020 3:00 PM
tex-43192171
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

# IN THE SUPREME COURT OF TEXAS

No. 18-1167

THE EL PASO EDUCATION INITIATIVE, INC., D/B/A BURNHAM WOOD
CHARTER SCHOOL, PETITIONER,

v.

AMEX PROPERTIES, LLC, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE EIGHTH DISTRICT OF TEXAS

**Argued April 8, 2020**

JUSTICE BLAND delivered the opinion of the Court.

JUSTICE BLACKLOCK filed a concurring opinion, in which CHIEF JUSTICE HECHT joined.

In this case, we decide two issues. First, whether open-enrollment charter schools have governmental immunity. Second, whether that immunity is waived for a landlord's claim against one such school for anticipatory breach of a lease. Although the legislature has directed that open-enrollment charter schools have governmental immunity, we have not expressly held that they do.[1] We hold today that open-enrollment charter schools and their charter-holders have governmental immunity from suit and liability to the same extent as public schools.

---

[1] *See Neighborhood Ctrs. Inc. v. Walker*, 544 S.W.3d 744, 753–54 (Tex. 2018).

Chapter 271 of the Local Government Code waives immunity for breach-of-contract claims against a "local governmental entity" if, among other requirements, the contract is "properly executed."[2] The parties agree that the open-enrollment charter school district in this case qualifies as a local governmental entity, but they disagree about whether the school district "properly executed" the lease. Because the undisputed facts demonstrate that the district's governing board did not approve the lease, we hold that the lease was not "properly executed" as Chapter 271 requires. Accordingly, the district has immunity from this suit.

## I

### A

The Burnham Wood Charter School District operates open-enrollment charter schools in El Paso under charters from the Texas Education Agency.[3] At a January 2008 board of directors' meeting, Iris Burnham, the president and superintendent of the district, told the board that the district planned to explore sites in east El Paso for a new open-enrollment charter school, Vista del Futuro. At the board's April meeting, Burnham reported that she had identified a site and had begun to negotiate a lease agreement with Amex Properties, LLC, through one of Amex's owners, Sylvia Martinez Aguirre. Burnham presented a proposal that included a "projected multi-year rent schedule and budget for Vista del Futuro." She requested permission to "continue to negotiate a lease" with Martinez, which the board granted. Burnham and Martinez signed a lease in late April. The lease required the district to pay approximately $3.4 million over an initial ten-year term. Amex agreed to construct two school buildings for the district's use. The lease specified that "[the

---

[2] TEX. LOC. GOV'T CODE §§ 271.151(2)(A), .152.

[3] Burnham Wood Charter School District is the assumed business name for The El Paso Education Initiative, Inc.

2

district] shall use the Leased Premises solely for the purpose of conducting its business[,] . . . described as a public charter school." The final paragraph states that each signatory "represents and warrants" that she has the authority to execute the lease and that it is "binding upon the entity" she represents:

> AUTHORITY OF SIGNATORIES. Each person executing this Lease individually and personally represents and warrants that he/she is duly authorized to execute and deliver the same on behalf of the entity for which he/she is signing (whether a corporation, general or limited partnership or otherwise) and that this Lease is binding upon the entity in accordance with its terms.

Burnham signed on behalf of "The El Paso Education Initiative, Inc.," as its president, and a notary attested that Burnham "executed the instrument on behalf of the El Paso Education Initiative, Inc."

Despite these representations, Amex understood that the district's board had to approve the lease to finalize it. In an April 27 email—sent three days after Burnham signed the lease—Amex's attorney wrote the district's attorney:

> When we spoke last week, you mentioned that you would be able to provide a resolution or minutes setting out that this deal has been approved by the governing board for the corporation and authorizing Ms. Burnham to negotiate and sign the lease. I will need to have that document as we hopefully get this thing done in the next day or so.[4]

Negotiations over the lease terms persisted after Burnham and Martinez signed it. Points of contention included the occupancy date for the first school building, whether the district could recover damages if Amex did not complete the building on time, and the district's deposit amount.

---

[4] The district's attorney later averred that he and Burnham "only had the authority to negotiate a lease and bring the proposal back to the School Board." He explained:

> We did not have the legal authority to bind the District to a lease of real property. No individual had the legal authority to bind the District to a lease of real property. Instead, any final lease terms negotiated by myself and Ms. Burnham with Amex Properties would have to be approved by the board of the District.

About two weeks later, on May 13, the district repudiated the lease. The district's attorney wrote Amex, stating that the district had "reject[ed] [Amex's] 28 April 2008 counteroffer for lease of this property," and that "by e-mail correspondence on the 8th of May we reiterated the position of [the district] that there is no lease agreement covering the property." He concluded: "[The district] rejects your assertion that there is any lease agreement between [the district and Amex]."

Burnham did not present the lease to the district's board for its approval. At a May 28 board meeting, Burnham reported that the Amex negotiations had been "unsuccessful."[5] Despite the lack of board approval, Amex secured a construction contract to construct a building on its site, and the builder commenced construction activity. Amex ultimately leased the property to another tenant at a lower rate.

**B**

Amex sued the district for anticipatory breach of the lease, seeking damages that include some of the construction costs that Amex incurred in paying the third-party builder. Through a lengthy course of proceedings in the trial and appellate courts, the district filed multiple pleas to jurisdiction, asserting that it is immune from this suit.[6] In its jurisdictional plea for this appeal, the district contends that it is immune from suit to the same extent as public school districts and that no waiver of immunity exists for Amex's claim. In particular, the district argues that the lease was

---

[5] The meeting minutes state: "[Burnham] provided the Board with background of the unsuccessful lease negotiations that took place between [the district] and Ms. Sylvia Martinez, the lessor of the space/building that had been considered for this new charter school."

[6] In its initial plea, the district asserted that Local Government Code section 271.152 did not apply because no contract was formed, and the district therefore retained its immunity. The trial court denied the plea on that ground, the court of appeals affirmed, and we denied review. *El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 385 S.W.3d 701, 706, 708 (Tex. App.—El Paso 2012, pet. denied).

not "properly executed" as Local Government Code Chapter 271 requires.[7] The district further contends that the construction costs that Amex incurred are consequential damages, which Chapter 271 excludes from its waiver of immunity.[8]

The trial court denied the district's jurisdictional plea on these issues, and the court of appeals affirmed.[9] The court of appeals concluded that "Texas open-enrollment charter schools are governmental entities entitled to immunity from suit to the same extent as public-school districts,"[10] but it held that fact issues existed at to whether the lease was "properly executed."[11] Based on the recitals in the lease, the court explained, "Burnham had at least some authority to enter into the Lease Agreement . . . ."[12] The court further held that fact issues existed as to whether Amex's alleged damages for construction expenses were consequential.[13] We granted review.

## II

### A

Public school districts are generally entitled to governmental immunity from liability and suit.[14] Immunity from liability bars enforcement of a judgment against a school district, and

---

[7] TEX. LOC. GOV'T CODE § 271.151(2)(A).

[8] *Id.* § 271.153(b)(1).

[9] 564 S.W.3d 228, 232, 243, 246 (Tex. App.—El Paso 2018).

[10] *Id.* at 235.

[11] *Id.* at 243.

[12] *Id.*

[13] *Id.* at 246. The court also held that Amex cannot recover its attorney's fees. *Id.* at 247. Amex does not challenge that ruling in this Court.

[14] *See Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 429–30 (Tex. 2016) ("Political subdivisions of the state—such as counties, municipalities, and school districts—share in the state's inherent immunity.").

immunity from suit bars prosecution of a suit brought against it.[15] Although we have identified the prospect, we have never recognized that open-enrollment charter schools are entitled to governmental immunity.[16] Because the parties dispute the availability of a legislative waiver in this case, we consider first whether open-enrollment charter schools and charter-holders have governmental immunity to the same extent as public schools and then whether that immunity is waived.

Sovereign immunity is a common-law doctrine, "initially developed without any legislative or constitutional enactment."[17] It therefore "remains the judiciary's responsibility to define the boundaries of the common-law doctrine and to determine under what circumstances sovereign immunity exists in the first instance."[18]

---

[15] *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006) ("In Texas, governmental immunity has two components: immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether." (footnotes omitted)); *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006) ("Sovereign immunity encompasses immunity from suit, which bars a suit unless the state has consented, and immunity from liability, which protects the state from judgments even if it has consented to the suit.").

[16] *See LTTS Charter Sch., Inc. v. C2 Constr., Inc.*, 342 S.W.3d 73, 78 n.44 (Tex. 2011) (leaving "undecided" whether an open enrollment charter school was immune from suit); *see also Neighborhood Ctrs. Inc. v. Walker*, 544 S.W.3d 744, 753–54 (Tex. 2018) (noting that the legislature has directed that open-enrollment charter schools have immunity but not deciding common-law governmental immunity because the Texas Whistleblower Act did not enumerate charter schools among those that can be sued under the Act); *Neighborhood Ctrs.*, 544 S.W.3d at 755 (Johnson, J., concurring) ("I do not read the Court's opinion in this case to endorse the concept that under the Texas Constitution the Legislature is authorized to grant sovereign or governmental immunity, or that it has done so in [Texas Education Code] section 12.1056(a).").

[17] *Wasson*, 489 S.W.3d at 431 (quoting *Reata*, 197 S.W.3d at 374).

[18] *City of Galveston v. State*, 217 S.W.3d 466, 471 (Tex. 2007) (quoting *Reata*, 197 S.W.3d at 375); *Wasson*, 489 S.W.3d at 432 ("[T]the very fact that [immunity] has developed through the common law—and has remained there—has important implications. Namely, as the arbiter of the common law, the judiciary has historically been, and is now, entrusted with 'defin[ing] the boundaries of the common-law doctrine and . . . determin[ing] under what circumstances sovereign immunity exists in the first instance.'" (alterations in original) (quoting *Reata*, 197 S.W.3d at 375)).

Though the courts determine governmental immunity's boundaries, the legislature informs that determination.[19] Thus, "where the governing statutory authority demonstrates legislative intent to grant an entity the 'nature, purposes, and powers' of an 'arm of the State government,' that entity is a government unit unto itself."[20] Applying that principle in *Ben Bolt-Palito Blanco Consolidated Independent School District v. Texas Political Subdivisions/Joint Self-Insurance Fund*, we held that a self-insurance fund had governmental immunity because the fund's "governing statutory authority" granted it "purposes and powers" that "demonstrate legislative intent that it exist as a distinct governmental entity entitled to assert immunity . . . for the performance of a governmental function."[21] In *Rosenberg Development Corporation v. Imperial Performing Arts, Inc.*, we reached the opposite conclusion, examining the "express indicators of legislative intent" to hold that a municipally created "economic development corporation[]" was not a governmental entity.[22]

In deciding whether to extend immunity to a legislatively authorized entity, we also examine whether it would serve "the nature and purposes of immunity."[23] In declining to extend immunity to the economic development corporation in *Rosenberg*, we observed that "the immunity

---

[19] *Univ. of the Incarnate Word v. Redus*, ___ S.W.3d ___, ___ (Tex. 2020) ("The legislature informs [the judiciary's definition of the boundaries of sovereign immunity] when it authorizes an entity to act as an arm of the State government, and the legislature further determines when and to what extent to waive that immunity." (quotation marks omitted)); *see also Dugger v. Arredondo*, 408 S.W.3d 825, 829 (Tex. 2013) ("[S]tatutes can modify common law rules, but before we construe one to do so, we must look carefully to be sure that was what the Legislature intended." (quoting *Energy Serv. Co. of Bowie v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex. 2007))).

[20] *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006) (quoting *Harris Cty. Flood Control Dist. v. Mann,* 140 S.W.2d 1098, 1101 (Tex. 1940)).

[21] *Id.* at 325–26.

[22] *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 741 (Tex. 2019).

[23] *Id.* at 750.

doctrine's underlying purposes" were not served.[24] We have identified two purposes in sovereign immunity's modern-day context: protecting the separation of government power and preserving the public treasury.[25] Sovereign immunity respects "the relationship between the legislative and judicial branches of government" and "preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars."[26]

**B**

The Texas Constitution requires the legislature to "establish and make suitable provision for the support and maintenance of an efficient system of public free schools."[27] Since 1995, the legislature has made open-enrollment charter schools "part of the public school system of this state."[28] "As their name suggests," open-enrollment charter schools are "generally open to the public for the instruction offered" and "tuition-free."[29]

The legislature authorized open-enrollment charter schools to "increase the choice of learning opportunities within the public school system" and to "encourage different and innovative learning methods."[30] Charter schools operate under a contract—the charter[31]—with the

---

[24] *Id.* at 741.

[25] *Univ. of the Incarnate Word v. Redus*, ___ S.W.3d ___, ___ (Tex. 2020) (citing *Brown & Gay Eng'g v. Olivares*, 461 S.W.3d 117, 123–24 (Tex. 2015)).

[26] *Brown & Gay Eng'g*, 461 S.W.3d at 121 (first citing and quoting *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 97 (Tex. 2012); then citing *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 414 (Tex. 1997) (Hecht, J., concurring) (outlining modern political and financial reasons for sovereign immunity)).

[27] TEX. CONST. art. VII, § 1.

[28] TEX. EDUC. CODE § 12.105; *see also Honors Acad., Inc. v. Tex. Educ. Agency*, 555 S.W.3d 54, 57 (Tex. 2018) (quoting *LTTS Charter Sch., Inc. v. C2 Constr., Inc.*, 342 S.W.3d 73, 74 (Tex. 2011)).

[29] *Neighborhood Ctrs. Inc. v. Walker*, 544 S.W.3d 744, 750 (Tex. 2018). Chapter 12, Subchapter D of the Education Code authorizes and regulates open-enrollment charter schools. *See* TEX. EDUC. CODE §§ 12.101–.15.

[30] TEX. EDUC. CODE § 12.001(a)(2), (5).

[31] *Id.* §§ 12.101(b), .102(2) ("An open-enrollment charter school . . . is governed under the governing structure described by the charter.").

Commissioner of Education. Under its charter, an open-enrollment charter school must meet the Commissioner's "financial, governing, educational, and operational standards."[32] Although the typical charter-holder is a private, nonprofit organization, it nonetheless must adhere to state law and the Commissioner's regulations governing public schools or risk revocation of its charter.[33] Like public school districts, open-enrollment charter schools are largely publicly-funded.[34] Last school year, charter schools enrolled over 300,000 schoolchildren—nearly 6% of Texas students— and received nearly $3 billion in public funds.[35] Finally, the legislature directs that "[i]n matters related to operation of an open-enrollment charter school, an open-enrollment charter school or charter holder is immune from liability and suit to the same extent as a school district . . . ."[36]

_____

[32] *Neighborhood Ctrs.*, 544 S.W.3d at 750. Open-enrollment charter schools are one "class" of charter schools. TEX. EDUC. CODE § 12.002. Open-enrollment "charters are typically held and run by nonprofit corporations, qualifying under § 501(c)(3) of the Internal Revenue Code. . . . Although less common, institutions of higher education and governmental entities are also eligible to apply for such a charter." *Honors Acad.*, 555 S.W.3d at 57 (citing TEX. EDUC. CODE § 12.101(a)(1), (3), (4)).

[33] TEX. EDUC. CODE § 12.103(a) ("[A]n open-enrollment charter school is subject to federal and state laws and rules governing public schools . . . ."); *see also id.* § 12.115 (providing for charter revocation).

[34] *Id.* § 12.106(a) ("A charter holder is entitled to receive" funding for the open-enrollment charter school based in part on student "weighted average daily attendance" and on "the state average tax effort."); *id.* § 12.106(b) ("An open-enrollment charter school is entitled to funds that are available to school districts from the agency or the commissioner in the form of grants or other discretionary funding unless the statute authorizing the funding explicitly provides that open-enrollment charter schools are not entitled to the funding."); *see id.* § 12.106(c) ("The commissioner may adopt rules to provide and account for state funding of open-enrollment charter schools under this section."); *see also Neighborhood Ctrs.*, 544 S.W.3d at 750 (commenting that open-enrollment charter schools "are generally entitled to state funding and services as if they were a school district" (footnotes omitted)).

[35] TEX. EDUC. AGENCY, CHARTER SCHOOL FUNDING (2019), https://tea.texas.gov/sites/default/files/Charter%20Schools%20one%20pager%202019%20Revised%20February.pdf; DIV. OF RESEARCH & ANALYSIS, OFFICE OF GOVERNANCE & ACCOUNTABILITY, TEX. EDUC. AGENCY, ENROLLMENT IN TEXAS PUBLIC SCHOOLS 2018–19 47 (2019), https://tea.texas.gov/sites/default/files/enroll_2018-19.pdf.

[36] TEX. EDUC. CODE § 12.1056(a). We previously considered section 12.1056 in *Neighborhood Centers, Inc. v. Walker*, 544 S.W.3d 744 (2018). We noted that Education Code section 12.1058 characterizes an open-enrollment charter school as a "local governmental entity" when (1) the applicable statute specifically states that the statute applies to an open-enrollment charter school, or (2) a provision in Chapter 12 states that a specific statute applies to an open-enrollment charter school. *Neighborhood Ctrs.*, 544 S.W.3d at 753 (citing TEX. EDUC. CODE § 12.1058(c)). Reading section 12.1056(a) and section 12.1058(c) together, we held that "an open-enrollment charter school is not to be treated as a governmental entity or school district unless a statute specifically states that it is, but when there is such a statute, the open-enrollment charter school's immunity from liability and suit is the same as a school district's." *Id.*

We conclude that open-enrollment charter schools act as an arm of the State government.[37] These schools are accountable to State government through oversight of their charters and through the receipt of substantial public funding. They exercise the same powers and perform government tasks in the same manner as traditional public schools.[38] They expressly operate as part of the State's public education system, and they are generally open to the public.

Extending governmental immunity to open-enrollment charter schools also satisfies governmental immunity's purposes.[39] Diverting charter school funds to defend lawsuits and pay judgments affects the State's provision of public education and reallocates taxpayer dollars from the legislature's designated purpose.[40] Conferring immunity respects the legislature's decision to fulfill its constitutional obligation to provide a free, public education through charter schools,[41] its allocation of tax dollars to meet that objective, and its directive that charter schools and charter-holders have immunity from suit and liability to the same extent as public schools. Accordingly,

---

[37] *See Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 749 (Tex. 2019); *see also LTTS Charter Sch., Inc. v. C2 Constr., Inc.*, 342 S.W.3d 73, 77–78 (Tex. 2011) ("Put simply, open-enrollment charter schools wield many of the same powers as traditional public schools."); *Univ. of the Incarnate Word v. Redus*, ___ S.W.3d ___, ___ (Tex. 2020) (observing that "[t]he legislature's limited authorization to private universities to commission peace officers stands in contrast to its incorporation of open-enrollment charter schools into the State's public education system").

[38] *See LTTS*, 342 S.W.3d at 77.

[39] *Univ. of the Incarnate Word*, ___ S.W.3d at ___ (examining whether a private university operating a police department "act[s] as an arm of the State government and whether affording it sovereign immunity fit[s] within the doctrine's underlying nature and purposes" (citing *Rosenberg*, 571 S.W.3d at 750 ("The common-law rule of immunity is exclusively for the judiciary to define, and in doing so, we do not just consider whether the entity performs governmental functions, but also the 'nature and purposes' of immunity."))).

[40] *See Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 124 (Tex. 2015) ("Litigation against the government . . . disrupts the government's allocation of funds on the back end, when the only option may be to divert money previously earmarked for another purpose. It is this diversion—and the associated risk of disrupting government services—that sovereign immunity addresses." (footnote omitted)).

[41] *See Morath v. Tex. Taxpayer & Student Fairness Coal.*, 490 S.W.3d 826, 886 (Tex. 2016) (acknowledging the legislature's "constitutional duty to fashion a [free, public] school system fit for our dynamic and fast-growing State's unique characteristics").

we hold that open-enrollment charter schools and charter-holders are entitled to governmental immunity.

**III**

The Education Code incorporates Local Government Code Chapter 271's waiver of immunity for breach-of-contract claims brought against open-enrollment charter schools:

> An open-enrollment charter school is a local governmental entity as defined by Section 271.151, Local Government Code, and is subject to liability on a contract as provided by Subchapter I, Chapter 271, Local Government Code, and only in the manner that liability is provided by that subchapter for a school district.[42]

Local Government Code Chapter 271, in turn, waives immunity for breach-of-contract claims brought against a local governmental entity for contracts subject to the chapter, if the terms and conditions of the chapter are met:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.[43]

The parties do not dispute that the lease concerns a "matter[] related to operation of an open-enrollment charter school."[44] They disagree, however, whether a waiver exists under Chapter 271.[45]

To invoke Chapter 271, the party claiming a breach of contract "must in fact have entered into a contract that is 'subject to this subchapter,' as defined by section 271.151(2)."[46] A contract

---

[42] TEX. EDUC. CODE § 12.1056(d).

[43] TEX. LOC. GOV'T CODE § 271.152.

[44] TEX. EDUC. CODE § 12.1056(a). The Education Code provides that charter-holders may lease property with state funds. *See id.* §§ 12.106(f), .128.

[45] *Id.* § 12.1056(d).

[46] *City of Houston v. Williams*, 353 S.W.3d 128, 134–35 (Tex. 2011).

"subject to this subchapter" means "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is *properly executed* on behalf of the local governmental entity . . . ."[47] The parties do not contest that the lease in this case includes "services,"[48] but dispute whether it was "properly executed" as section 271.151(2)(A) requires.

The district observes that Texas Education Agency regulations require that a charter school's governing board approve contracts like this one, unless the board has delegated its authority through an amendment to the school's charter, approved by the Commissioner of Education. Because the district's board never approved the lease and did not delegate its authority, the lease was not "properly executed." Thus, the district argues, section 271.152 does not waive its immunity.

Amex responds that agency regulations do not define the boundaries of governmental immunity. Pointing to Burnham's signature on the lease, it argues that fact questions exist as to whether the lease was "properly executed"—principally, whether Burnham had the authority to sign the lease "on behalf of" the district. Amex further argues that the district conflates a defense to enforcement of the lease with Amex's burden in a jurisdictional inquiry, which Amex met by proffering the lease recitals stating that Burnham had the authority to act on behalf of the district.

---

[47] TEX. LOC. GOV'T CODE § 271.151(2)(A) (emphasis added).

[48] *See Lubbock Cty. Water Control & Imp. Dist. v. Church & Akin*, *L.L.C.*, 442 S.W.3d 297, 302 (Tex. 2014) ("Although the contract at issue in this case is a lease of real property, 'a contractual relationship can include both the granting of a property interest *and* an agreement to provide goods or services.'" (quoting *Coinmach Corp. v. Aspenwood Apartment Corp.,* 417 S.W.3d 909, 925 (Tex. 2013))); *but cf. Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 437 (Tex. 2016) ("[G]enerally, contracts for land leases . . . are not covered by Chapter 271.").

In construing the statute to determine the meaning of "properly executed," our goal is "to ascertain and give effect to the Legislature's intent."[49] "[W]e look to and rely on the plain meaning of a statute's words as expressing legislative intent unless a different meaning is supplied, is apparent from the context, or the plain meaning of the words leads to absurd or nonsensical results."[50] Section 271.151 does not define "properly executed;" thus, we employ its plain and common meaning.[51] And we read the statute to give effect to every word.[52] The adjective "properly" necessarily limits the verb "executed," leading to the inexorable conclusion that not *all* executed contracts qualify for Chapter 271's waiver. In this context, a contract is *properly* executed when it is executed in accord with the statutes and regulations prescribing that authority. "Proper" means "[a]ppropriate, suitable, right, fit, or correct; *according to the rules*."[53] Open-enrollment charter schools operate pursuant to statute. Accordingly, they may enter into a contract only in the manner the legislature has authorized.[54]

---

[49] *Tex. Mut. Ins. Co. v. Ruttiger*, 381 S.W.3d 430, 452 (Tex. 2012).

[50] *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017).

[51] *See Brazos Elec. Power Coop., Inc. v. Tex. Comm'n on Envtl. Quality*, 576 S.W.3d 374, 384 (Tex. 2019); TEX. GOV'T CODE § 311.011(a) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage."); *see also TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("Undefined terms in a statute are typically given their ordinary meaning [unless] a different or more precise definition is apparent from the term's use in the context of the statute . . . .").

[52] *Brazos*, 576 S.W.3d at 384; *see also Perkins v. State*, 367 S.W.2d 140, 146 (Tex. 1963) ("[I]t is settled that every word in a statute is presumed to have been used for a purpose; and a cardinal rule of statutory construction is that each sentence, clause and word is to be given effect if reasonable and possible.").

[53] *Proper*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added); *see also Hous. Auth. of City of Dall. v. Killingsworth*, 331 S.W.3d 806, 811 (Tex. App.—Dallas 2011, pet. denied) ("'Properly' means 'suitably, fitly, rightly, [or] correctly.'" (alteration in original) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1818 (1981))).

[54] *See City of Sherman v. Pub. Util. Comm'n of Tex.*, 643 S.W.2d 681, 686 (Tex. 1983) (observing that "[a]gencies may only exercise those powers granted by statute, together with those necessarily implied from the statutory authority conferred or duties imposed").

It is not enough, then, that an open-enrollment charter school's representative signs a contract. Rather, to avail itself of a waiver of immunity, a party asserting a breach-of-contract claim against an open-enrollment charter school must demonstrate that the contract's execution comports with the authority the legislature granted the school in its charter, including the statutory and regulatory requirements placed on open-enrollment charter schools entering (or seeking to enter) contractual relationships. We look to that framework to determine whether this lease was "properly executed."

The Texas Administrative Code addresses charters in the "Commissioner's Rules Concerning Open-Enrollment Charter Schools." These rules provide that "[a]n open-enrollment charter grants to the governing body of a charter holder the authority to operate a charter school."[55] The Commissioner's Rules further provide that a charter's governing body's powers "shall not be delegated," absent certain conditions:

> Except as provided by this section, the governing body's powers and duties to operate the charter school shall not be delegated, transferred, assigned, encumbered, pledged, subcontracted, or in any way alienated by the governing body of the charter holder. Any attempt to do so shall be null and void and of no force or effect and shall constitute abandonment of the contract for charter.[56]

The Commissioner's Rules establish the "[e]xclusive method for delegating charter powers and duties."[57] The rules demand that the charter-holder "file a request" for a delegation amendment, which must be "approved by the commissioner of education in writing" for any delegation of authority by a governing body.[58] Unless the Commissioner has accepted a written delegation as a

---

[55] 19 TEX. ADMIN. CODE § 100.1101(b).

[56] *Id.* § 100.1101(b)(2).

[57] *Id.* § 100.1101(c).

[58] *Id.* § 100.1033(a)–(b).

14

charter amendment, a contract that "authorize[s] the expenditure or obligation of state funds" is one of the "powers and duties" that the "governing body of the charter holder itself" must exercise.[59]

Amex argues that agency regulations do not define the scope of immunity for open-enrollment charter schools, and we agree. In adopting rules for open-enrollment charters, however, the agency does not limit the legislature's waiver of immunity. Those regulations instead provide an avenue for the school's governing body to delegate its authority; absent that avenue, a charter school's governing body must approve the contract. That courts examine those rules in considering whether a contract complies with Chapter 271's "proper execution" requirement and, consequently, in determining immunity, does not render the regulations an improper exercise of administrative authority.

The court of appeals equated the board's authorization to Burnham to negotiate a lease with approval of the final agreement.[60] But the district proffered evidence that Burnham never presented the board with the lease and that the board never voted to approve it. Amex adduced no contrary evidence that the governing body in this case—the district's board—approved the lease, or that an amendment to the charter existed authorizing Burnham to act without board approval on behalf of

---

[59] *Id.* § 100.1033(b)(14)(C)(ii). A lease qualifies as an encumbrance of state funds requiring governing body approval. Open-enrollment charter schools are entitled to public funds. *See* TEX. EDUC. CODE § 12.106 (providing state funding for charter schools). Section 12.107 of the Education Code stipulates that the funds a charter-holder receives under section 12.106 "may be used only for a purpose for which a school may use local funds under Section 45.105(c)." *Id.* § 12.107(a)(3). Section 45.105(c), in turn, allows funds to be used for a variety of purposes, "including acquiring school buildings and sites by leasing through annual payments with an ultimate option to purchase, and for other purposes necessary in the conduct of the public schools . . . ." *Id.* § 45.105(c).

[60] *See* 564 S.W.3d 228, 243 (Tex. App.—El Paso 2018).

the board.[61] Absent board approval or a charter amendment delegating the board's authority to Burnham, the lease was not "properly executed on behalf of" the district because the board did not approve it.[62]

Our analysis does not change because the statute states that a contract must be "properly executed *on behalf of* the local governmental entity" rather than "*by*" the local governmental entity. This language acknowledges that contracts with local governmental entities are not typically signed by all members of the entity's governing authority. Yet, just as a government official cannot bind the government to a contract based on apparent authority,[63] an agent acting on behalf of a charter-holder cannot bind it in a way that exceeds its statutory grant of authority to enter into contracts. Burnham acted as the board's authorized negotiator, but she lacked the power to "properly execute" the lease "on behalf of" the board without board approval. Amex's attorney acknowledged as much when he requested that the district verify that the board had approved the lease with a board resolution or minutes of a board meeting.

Amex also contends, and the court of appeals agreed, that the district conflates jurisdiction with contract illegality, and Burnham's lack of authority is akin to an illegality defense.[64] Illegality, the court of appeals held, is an affirmative defense that involves the merits of Amex's contract

---

[61] *See LTTS Charter Sch., Inc. v. C2 Constr., Inc.*, 358 S.W.3d 725, 744 (Tex. App.—Dallas 2011, pet. denied) (holding that a contract was not "properly executed" where an open-enrollment charter school granted a representative authority to negotiate with a construction company but never approved any contract with the company).

[62] 19 TEX. ADMIN. CODE §§ 100.1033(a)–(b), .1101(b)–(c).

[63] *State ex rel. Dep't of Criminal Justice v. VitaPro Foods, Inc.*, 8 S.W.3d 316, 322 (Tex. 1999) ("Only persons having actual authority to act on behalf of the State can bind the State in contract."). Amex has conceded that its "claim is not premised on a theory of apparent authority."

[64] *See* 564 S.W.3d at 241.

claim, not a trial court's subject-matter jurisdiction.[65] We agree that contract claims against local governments may fail based on defenses that are not jurisdictional.[66] Chapter 271, however, conditions a waiver of immunity on a "properly executed" contract, placing contract authorization as a jurisdictional consideration, in addition to a contract defense.[67]

Finally, Amex argues that the district should be estopped from asserting immunity. It notes that, at the time Burnham signed the contract, the extent to which the district was immune from suit was unsettled. We have held, however, that "[a]s a general rule, a court cannot acquire subject matter jurisdiction by estoppel."[68]

* * *

We conclude that open-enrollment charter schools and their charter-holders have governmental immunity to the same extent as public schools. Local Government Code Chapter

---

[65] In considering the question of proper execution, the court of appeals addressed the authority argument but stated that the district did "not argue that Burnham lacked actual or apparent authority to sign the Lease Agreement." *Id.* at 241 n.4. Amex conceded in its fifth amended petition, however, that the district's 2014 Supplemental Answer was "based upon lack of authority to enter into the lease." And as the court of appeals noted, the district argued in its briefing that Burnham could not bind it without board approval absent a delegation amendment to its charter. *See id.* at 236. Thus, the district properly challenged Burnham's actual authority to execute the lease.

[66] In *City of Denton v. Rushing*, we considered whether a policy manual was a "written contract" subject to section 271.152's waiver of immunity. 570 S.W.3d 708, 709 (Tex. 2019). We held that no "valid written contract subject to a waiver of governmental immunity" existed and that "[f]or governmental immunity to be waived under section 271.152 of the Local Government Code, there must first be an enforceable, written contract." *Id.* at 713. We used the word "enforceable" to indicate that, for an "agreement" to be subject to section 271.152's waiver of immunity, it must, of course, be a contract. *City of Denton* should not be read to otherwise require that a contract ultimately be enforceable to clear the jurisdictional hurdle.

[67] Amex's reliance on *Jefferson County. v. Jefferson County Constables Ass'n*, 546 S.W.3d 661 (Tex. 2018), is misplaced. There, the county argued that the plaintiffs lacked standing because their collective bargaining agreement was invalid, thereby depriving the courts of subject-matter jurisdiction. *Id.* at 665–66. We rejected the argument, noting that "illegality is an affirmative defense to a claim, not an impediment to a party's standing to assert it." *Id.* at 666 (citing TEX. R. CIV. P. 94). By contrast, here, in a plainly jurisdictional statute, the legislature has determined that whether a court may hear the case at all turns on whether the contract was properly executed.

[68] *In re Crawford & Co.*, 458 S.W.3d 920, 928 n.7 (Tex. 2015) (per curiam); *Wilmer-Hutchins Indep. Sch. Dist. v. Sullivan*, 51 S.W.3d 293, 294 (Tex. 2001).

271 waives that immunity for breach-of-contract claims brought under the chapter. Because the lease in this case was not "properly executed" as Local Government Code section 271.151 requires, however, immunity from Amex's breach-of-contract claim is not waived under section 271.152. Accordingly, we hold that the district retains its governmental immunity. We reverse the judgment of the court of appeals and dismiss this suit for want of jurisdiction.[69]

_____

Jane N. Bland
Justice

OPINION DELIVERED:  May 22, 2020

---

[69] In light of our disposition, we need not address the portion of the district's plea challenging waiver of immunity for Amex's alleged damages.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below:

Envelope ID: 43192171
Status as of 05/22/2020 15:03:22 PM -05:00

Associated Case Party: Amex Properties, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Henry Paoli | | hpao@scotthulse.com | 5/22/2020 3:00:36 PM | SENT |
| Casey S.Stevenson | | cste@scotthulse.com | 5/22/2020 3:00:36 PM | SENT |
| Sofia Vargas | | svar@scotthulse.com | 5/22/2020 3:00:36 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ruth H.Davis | | rdav@scotthulse.com | 5/22/2020 3:00:36 PM | SENT |
| Stuart R. Schwartz | 17869750 | ssch@scotthulse.com | 5/22/2020 3:00:36 PM | SENT |
| Joseph L. Hood | 9943250 | hood@windlehood.com | 5/22/2020 3:00:36 PM | SENT |